UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| DARNELL WESLY MOON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23 CV 71 CDP |
| | ) | |
| NED BOYD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Self-represented plaintiff Darnell Wesly Moon brings this action alleging that Dunklin County officials, Jail employees, and deputy United States Marshals violated several of his federal constitutional and statutory rights when he was detained at the Dunklin County Jail in 2018. The matter is now before me upon review of Plaintiff's Second Amended Complaint under 28 U.S.C. § 1915.[1] Based on that review, I will dismiss all defendants except Dunklin County Jail Administrator Nicole Green. I will direct the Clerk of Court to issue process to Green in her individual capacity on Plaintiff's due process/Eighth Amendment claim of unconstitutional punishment and his First Amendment free-exercise-of-religion claim. All other defendants and federal claims will be dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. §

[1] Plaintiff was earlier granted leave to proceed in this action *in forma pauperis*. ECF 6.

1915(e)(2)(B). To the extent Plaintiff raises claims under Missouri law, I decline to exercise supplemental jurisdiction over those claims and will dismiss them without prejudice. *See* 28 U.S.C. § 1367(c)(2).

**I. Legal Standard on Initial Review**

Under 28 U.S.C. § 1915(e)(2), I may dismiss a complaint filed *in forma pauperis* if the action is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. When reviewing a complaint filed by a self-represented person under 28 U.S.C. § 1915, I liberally construe the complaint, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept the well-pleaded facts as true. *White v. Clark*, 750 F.2d 721, 722 (8th Cir. 1984). A "liberal construction" means that if the essence of an allegation is discernible, I should construe the complaint in a way that permits the claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even self-represented plaintiffs are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980); *see also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (refusing to supply additional facts or to construct a legal theory for the self-represented plaintiff).

To state a claim for relief, a complaint must plead more than "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that

are] supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires me to draw on my judicial experience and common sense. *Id.* at 679.

## II. Background

A. Plaintiff's History[2]

In 2008, Plaintiff was sentenced to seventy-eight months' imprisonment after pleading guilty in federal court to one count of armed robbery and one count of conspiracy to interfere with interstate commerce by robbery. *U.S. v. Moon*, Case No. 1:07CR133 RWS (E.D. Mo.). By 2009, as an incarcerated prisoner, Plaintiff had at least three cases dismissed as frivolous, malicious, or for failure to

---

[2] A Memorandum and Order entered in this case on July 24, 2023, contains a complete account of Plaintiff's criminal incarceration and litigation history. *See* ECF 6 at 2-5. I will not repeat that information here and will only discuss background information specifically relevant to evaluating Plaintiff's Second Amended Complaint. Since entry of that Order, Plaintiff's term of supervised release was revoked in *U.S. v. Moon*, Case No. 1:17CR05 AGF (E.D. Mo. Feb. 2, 2024) (judgment for revocation). The circumstances of that revocation are not relevant to the allegations in this case.

state a claim.[3] As such, some of Plaintiff's subsequently filed cases were dismissed under the "three strikes" provision of the Prison Litigation Reform Act of 1996 (PLRA), 28 U.S.C. § 1915(g).[4] Furthermore, in some of Plaintiff's cases where he was granted *in forma pauperis* status, this status was later revoked by the Court.[5] After Plaintiff's release from federal prison in July 2015 – when the PLRA's three-strikes provision was no longer applicable to him – Plaintiff filed approximately seventeen civil cases in Missouri, Illinois, Ohio, and Arkansas. *See Moon v. Fed. Bureau of Prisons*, Case No. 1:15CV197 ACL (E.D. Mo.), ECF 21 at 5.

In January 2017, a warrant issued from this Court based on a new indictment against Plaintiff for six fraud charges. *U.S. v. Moon*, Case No. 1:17CR05 AGF (E.D. Mo.). Plaintiff was arrested in June 2017 in Tennessee. By early July 2017, Plaintiff had been transported to and detained in the Dunklin County Jail (DCJ) in

---

[3] *Moon v. U.S.*, Case No. 1:09CV06 RWS (E.D. Mo.); *Moon v. Nat'l Asset Recovery Servs., Inc.*, Case No. 4:09CV117 DDN (E.D. Mo.); *Moon v. Nat'l Asset Recovery Servs., Inc.*, Case No. 4:09CV1129 DDN (E.D. Mo.). Plaintiff had additional cases dismissed as frivolous, malicious, or for failure to state a claim after 2009 as well. *See Moon v. Unterreiner*, Case No. 1:15CV160 SNLJ (E.D. Mo.); *Moon v. U.S.*, Case No. 1:15CV210 SNLJ (E.D. Mo.).

[4] *Moon v. Cape Girardeau Cnty. Sheriff's Dep't*, Case No. 1:11CV128 LMB (E.D. Mo.); *Moon v. Mo. Div. of Emp. Sec.*, Case No. 2:09CV4140 NKL, 2009 WL 3261920 (W.D. Mo.); *Moon v. Doerge*, Case No. 1:16CV208 ACL (E.D. Mo.); *Moon v. Boyd*, Case No. 1:17CV125 SNLJ (E.D. Mo.); *Moon v. Holder*; Case No. 1:17CV132 DDN (E.D. Mo.).

[5] *Moon v. Fed. Bureau of Prisons*, Case No. 1:15CV197 ACL (E.D. Mo.) (pauper status revoked due to abuse of the system); *Moon v. Fed. Bureau of Prisons*, Case No. 12-0416 (RWR), 2012 WL 6135856 (D.D.C.) (finding Plaintiff accumulated three strikes, vacated pauper status, and barred Plaintiff from proceeding *in forma pauperis* in future civil actions).

Missouri.  Over the following months, Plaintiff was moved between multiple institutions for holding.  Plaintiff pled guilty in April 2018 to the fraud charges, and he was sentenced in July 2018 to seventy-seven months' imprisonment to be followed by two years of supervised release.  *Id.*, ECF Nos. 49, 66.  Sometime after Plaintiff pleaded guilty in April, and before he was sentenced in July, Plaintiff was transferred back to DCJ for detention.  ECF 12 at 32-39.  This is the period of incarceration at issue in this matter.

Relevant to understanding the allegations of Plaintiff's pleadings, Plaintiff has described himself since at least 2018 as "well known for filing lawsuits" and as a "jailhouse lawyer" who "helps inmates file lawsuits against jails."  Case No. 1:17CR05 AGF, ECF 114 at 10-11 (July 16, 2018).  To date, a basic search of PACER (the federal court's electronic case records system), shows that Plaintiff has filed over 100 civil cases in federal courts across the country.

B.    Procedural History of This Case

Plaintiff filed this action in April 2023 and amended his complaint in May 2023.  On July 24, 2023, I reviewed Plaintiff's Amended Complaint under 28 U.S.C. § 1915 and found numerous deficiencies.  ECF 6.  However, since Plaintiff is self-represented in this proceeding, I provided him with a lengthy explanation of the deficiencies and gave him an opportunity to file a Second Amended Complaint

to cure them.[6]

Plaintiff filed his Second Amended Complaint on August 22, 2023 (ECF 12), along with a Response to the July 24, 2023, Order (ECF 11). On that same date, Plaintiff filed multiple other pro se motions, which are ruled by separate Order.

**III. The Second Amended Complaint**

Plaintiff's Second Amended Complaint is based on "abuse" he alleges occurred while he "was housed in solitary confinement in a medical isolation cage at the Dunklin County Jail in 2018." ECF 12 at 13. He brings thirteen claims for relief, including some under Missouri law: 1) § 1983 civil conspiracy; 2) First Amendment retaliation; 3) First Amendment free exercise of religion; 4) Religious Freedom Restoration Act (RFRA); 5) §§ 1985 and 1986 civil conspiracy; 6) conspiracy under Missouri law; 7) false imprisonment under Missouri law; 8) substantive due process; 9) § 1983 denial of medical care; 10) governmental liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); 11) negligence

[6] The Clerk of Court was directed to send Plaintiff a form complaint for use in filing his Second Amended Complaint. *See* ECF 6 at 17. On August 16, 2023, Plaintiff filed a Notice with the Court, stating that "he is not a 'prisoner' for PLRA purposes" and therefore, he would not be filing on the Court-provided "Prisoner Civil Rights Complaint" form. ECF 7 at 2. As I discussed in the July 24, 2023, Order, I was aware that Plaintiff was then currently serving a term of supervision at a halfway house. *See* ECF 6 at 3-4. However, the "Prisoner Civil Rights Complaint" form is used for complaints on conditions of confinement – regardless of a plaintiff's current status of confinement. Therefore, because Plaintiff's claims in this matter pertain to conditions of confinement while he was at DCJ in 2018, the "Prisoner Civil Rights Complaint" is the proper form complaint for this case.

under Missouri law; 12) negligence per se under Missouri law; and 13) intentional infliction of emotional distress under Missouri state law. ECF 12 at 40-60.

Plaintiff names nineteen defendants in his Second Amended Complaint, in their individual capacities only: Ned Boyd and Patrick James, Deputy United States Marshals; Nicole Green, Jail Administrator at DCJ; Ashley Grisham, Nurse at DCJ; Bob Holder and Corey Camp, Dunklin County Sheriff and Deputy Sheriff, respectively; Jimmy Smith and Marishia Sandefur, Lead Supervisors at DCJ; Dunklin County, Missouri; Dr. Charles Pewitt; and Ruby Lopez, Brandon Perkins, Mallory Snow, Kyle Simms, Joe Nelson, Unknown Cueland, David Pierce, Unknown West, and Jackie Burton, all of whom are Jailers at DCJ (hereafter collectively referred to as "Jailers"). ECF 12 at 9-12.

Plaintiff asserts that the following history forms the bases of his claims of alleged abuse: After a warrant issued from this Court in January 2017 on new charges against him, Plaintiff was detained at DCJ for a period beginning July 2017.[7] ECF 12 at 14. Plaintiff alleges that during this period of detention, he witnessed a lot of illegal drug use at DCJ, whereby inmates were getting drugs

[7] The Second Amended Complaint provides extensive information on Plaintiff's multiple periods of incarceration at various institutions going back to 2008. ECF 12 at 12-13. As to DCJ, Plaintiff had two main periods of incarceration in 2017 and 2018. The Court discussed in its prior Order that § 1983 claims are subject to a five-year statute of limitations. ECF 6 at 10. In response to that Order, Plaintiff explains that "he is fully aware of the statute of limitations, and that the incidents that occurred in 2017 were only mentioned to provide the court with background context." ECF 11 at 2. As such, aspects regarding Plaintiff's other periods of incarceration are discussed here only to the extent they are relevant to his 2018 holding at DCJ.

from Jail personnel.  As a result, Plaintiff filed numerous "kites," or complaints, to defendants Green and Sandefur that went unanswered.  *Id.* at 14-15.  He also requested to be placed in protective custody "because he did not feel safe."  *Id.* at 16.  He also filed a motion concerning these conditions of confinement in the criminal matter then-pending in this Court, requesting transfer to a Tennessee facility.  *See* Case No. 1:17CR05 AGF, ECF 18.  The Court held a hearing on July 19, 2017, and denied the motion.  *Id.*, ECF 22.  Plaintiff filed a second motion seeking transfer on July 28, 2017.  *Id.*, ECF 25.  Based on Plaintiff's allegation that there was a "real and immediate threat of harm to him" in DCJ, the Court communicated with the U.S. Marshal Service and was informed that Plaintiff had been housed in a single cell since July 21, 2017.  *Id.*, ECF 27.

After the Court hearing on July 19, deputy marshals Boyd and James questioned Plaintiff about the alleged drug activity at DCJ and informed him that they would search the DCJ cells where federal pretrial detainees were being held.  ECF 12 at 18-20.  After cells were searched, some inmates suspected that Plaintiff was the "snitch" that led to the jail search.  Plaintiff was assigned to a new cell in the housing unit where he had originally been housed at DCJ, but he refused the move and was placed in a booking cell.  *Id.* at 20-21.  He later filed a lawsuit against Boyd, alleging that he had "placed his life in danger" by attempting to move him back to his original housing unit.  *Id.* at 22-23.  The suit was dismissed on initial screening under the three-strikes rule, but Plaintiff alleges that Boyd

instructed DCJ administrator Green "to keep plaintiff in a single cell in the booking area of the jail, as a result of that lawsuit." *Id.* at 23.

Plaintiff states that during his 2017 period of incarceration at DCJ, he acted as a "jailhouse lawyer" and helped numerous inmates file state and federal lawsuits against many of the defendants named in this action. ECF 12 at 16-17, 22-25, 29-31. Plaintiff claims that defendant Green "mistreated" him because she was upset about all the lawsuits that Plaintiff helped inmates file about conditions of confinement at DCJ. Plaintiff states that he responded to the mistreatment by "popp[ing] a sprinkler" which "resulted in the jail flooding" in early September 2017. *Id.* at 25-26. After the flood, Plaintiff was moved to numerous other institutions for holding. He attempted suicide at one of them. *Id.* at 26-29.

With respect to the period of incarceration at issue in this case, that is, from May through July 2018, Plaintiff alleges the following facts: On "5/15/18," he helped a fellow inmate file and mail a federal suit against defendant Boyd, and "this caused defendants Boyd and James to move plaintiff [back] to the Dunklin County Jail." ECF 12 at 32-33. Plaintiff contends that a sign was posted at the DCJ intake area stating that "NO ONE EXCEPT NICOLE GREEN IS AUTHORIZED TO SPEAK TO [Plaintiff], PER NED BOYD AND PATRICK JAMES." *Id.* at 33. According to Plaintiff, Boyd contacted defendants Green and Grisham and told them that Plaintiff "was to be placed in the medical isolation cage, away from all detainees at the jail, and that the [w]indow of the cage was to

be covered up at all times." *Id.* at 31-32.  According to Plaintiff, Boyd and James also instructed defendants Holder and Green that:

> [P]laintiff was NOT to be provided with any showers, hygiene, access to a phone, access to his attorney, any pen and paper to send out any mail, no incoming mail, no commissary, no access to any grievance system to file grievances, including use of the kiosk, no medical care, and, inter alia, no change of clothing.

*Id.* at 32.  Plaintiff asserts that Boyd and James "reached an agreement" on two points:  1) "that under NO CIRCUMSTANCES was anyone at the Jail to speak to the plaintiff," and 2) "that plaintiff, a Sunni Muslim, was not given any religious accommodations whatsoever for Ramadan, which had started May 15th."  ECF 12 at 32.

Plaintiff alleges that despite the order not to speak with him, Plaintiff had "day-to-day contact" with thirteen of the named defendants:  Grisham, Camp, Smith, Sandefur, and the nine Jailers.  Plaintiff alleges that they all denied him requested hygiene items, including toilet paper, at the "behest of" Boyd, James, and Green.  They also allegedly denied him a shower and change of clothing.  ECF 12 at 34-35.

As to religious accommodations, Plaintiff alleges that defendants Smith, Sandefur, and Grisham informed him that his requests to Green for a prayer rug and to be put on a fasting schedule were denied.  Plaintiff also alleges that defendants Grisham, Camp, Smith, Sandefur, and Jailers all denied him the use of a clock in his cell, which he needed in order to know the time for daily prayers.

ECF 12 at 34.

Plaintiff also alleges that Grisham repeatedly mocked him and directed racial slurs at him and, "[a]t some point," denied him medical care for what Plaintiff suspected was a urinary tract infection. According to Plaintiff, Grisham and Green also "agreed to increase the temperature . . . to what felt like freezing." ECF 12 at 34-35. In addition, Plaintiff alleges that from his sentencing on July 16, 2018, until he was transferred from DCJ on July 29, 2018, he was denied a mattress and blanket. ECF 12 at 39. He claims that the mattress was removed from his cell at the direction of defendants Holder, James, Boyd, and Green, and that he slept on the floor. Plaintiff admits, however, that he had urinated on his mattress. *Id.* at 36.

Finally, as to defendant Dunklin County, Plaintiff alleges that it engaged in a pattern of retaliation against inmates who file lawsuits against DCJ employees. ECF 12 at 39-40. According to Plaintiff, inmates who filed lawsuits against the Jail and its employees "were targets" of defendants Green and Holder and were "put on commissary 'restriction' by accident, [and] moved to the booking area without explanation and kept up there for months at a time, until they decided to dismiss their civil case, or stop filing grievances." *Id.* at 40.

As relief, Plaintiff seeks a declaratory judgment and over $10 million in damages. ECF 12 at 60.

## IV.  Discussion

After carefully reading and liberally construing Plaintiff's Second Amended Complaint – and assuming the allegations to be true as I must at this stage of the litigation – I find that Plaintiff has alleged sufficient facts to state constitutional claims regarding being denied basic hygiene items and religious items over a ten-week period at DCJ in 2018.  However, based on the totality of the circumstances presented, the only defendant personally involved in and directly responsible for those alleged deprivations is defendant Nicole Green, Jail Administrator at DCJ.  I will therefore direct the Clerk of Court to issue summons or direct that summons issue against Nicole Green only, in her individual capacity, on these claims.  As to the remaining federal claims, however, Plaintiff's Second Amended Complaint fails to state a claim upon which relief may be granted.  For the reasons discussed below, those claims and the defendants against whom they are brought will be dismissed under 28 U.S.C. § 1915(e)(2)(B).

A.    Deputy U.S. Marshals Boyd and James – *Bivens* Analysis[8]

Plaintiff claims that for purposes of his § 1983 civil conspiracy claim raised in Count 1, Boyd and James were state actors given that their agreement to retaliate against Plaintiff included state actors Green, Holder, and Grisham.  *See* ECF 12 at 43-44.

---

[8] *Bivens v. Six Unknown Names Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

"Color of law is rooted in authority." *Yassin v. Weyker*, 39 F.4th 1086, 1090 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 779 (2023). "[I]n a § 1983 action," a defendant must "have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with [state] authority.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The question is whether the conduct is "fairly attributable to the State." *Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). To determine if it is, the focus is on the "nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997)).

Here, Plaintiff alleges that it was Boyd and James who intended to retaliate against him and that they instructed Green, Holder, and Grisham to engage in the alleged retaliatory conduct. State law, however, had nothing to do with the nature and circumstances of the deputy marshals' alleged conduct. At the time, they were acting as federal deputies charged with the duty of assigning places of detention for Plaintiff in relation to his conviction on federal criminal charges. No state actor directed the deputies' conduct, nor did the deputies act under State authority. I cannot say that either Boyd's or James's alleged conduct can be fairly attributable to the State in this case. They are not state actors for purposes of this action, and

Plaintiff's § 1983 claims against Boyd and James will be dismissed.  *See Yassin*, 39 F.4th at 1091.

To the extent Plaintiff brings a claim against Boyd and James directly under the Constitution for violation of his First Amendment right to freely exercise his religion (Count 3) and a claim of retaliation for exercising his First Amendment rights (Count 2), his only option against these federal officers acting under federal law is to seek redress under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  *See Yassin*, 39 F.4th at 1089.  But the Supreme Court has recognized a cause of action under *Bivens* on only three occasions:  *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment due process claim for gender discrimination); *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment cruel-and-unusual-punishment claim for failure to provide adequate medical care); and *Bivens*, 403 U.S. 389 (1971) (Fourth Amendment unreasonable-search-and-seizure claim).  *See Ahmed v. Weyker*, 984 F.3d 564, 567 (8th Cir. 2020).  According to the Supreme Court, expanding *Bivens* is "now a 'disfavored' judicial activity."  *Ziglar v. Abbasi*, 582 U.S. 120, 121 (2017) (quoting *Iqbal*, 556 U.S. at 675).  "The reason is that the separation of powers generally vests the power to create new causes of action in Congress, not [the courts]."  *Id.*

The Supreme Court "[has] never held that *Bivens* extends to First Amendment claims[.]"  *Egbert v. Boule*, 596 U.S. 482, 498 (2022).  Thus, Plaintiff's claims here raise a new *Bivens* context, which requires me to determine

whether any special factors cause hesitation or give me reason to pause before applying *Bivens* in that new context. *Ahmed*, 984 F.3d at 567-68. As detailed in *Egbert*, “there are many reasons to think that Congress, not the courts, is better suited to authorize [] a damages remedy” for a claim of First Amendment retaliation, 596 U.S. at 499, and I adopt those reasons here. Plaintiff’s claim of First Amendment retaliation in Count 2 is therefore dismissed against Boyd and James.

As to Plaintiff’s free-exercise claim in Count 3, the religious liberty protections provided by RFRA strongly militate against creating a *Bivens* action for such claims. That statute provides Plaintiff with a comprehensive remedial scheme for violations of substantial burdens on his religious exercise. Indeed, “Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment.” *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Under RFRA, burdens on religious exercise need not be intentional, only substantial, and claimants are provided with all appropriate relief for such violations. *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016). Given this alternative remedial scheme, there is no adequate justification for extending *Bivens* to First Amendment free-exercise claims. *Id.* Plaintiff’s First Amendment free-exercise claim raised in Count 3 against defendants Boyd and James will be dismissed.

To the extent Plaintiff brings conspiracy claims in Count 5 against Boyd and

James under §§ 1985 and 1986, they are addressed below.

B. Counts 1 and 5 – Civil Conspiracy under §§ 1983, 1985, 1986

In Count 1, Plaintiff brings a civil conspiracy claim under § 1983 alleging that deputy marshals Boyd and James "reached an agreement" with Holder, Grisham, and Green to retaliate against him; and that Boyd and James "reached an agreement" with and instructed Green and Holder to punish him by confining him to a medical isolation cell and limiting his access to hygiene, phone calls, commissary, grievance filings, and visitors in retaliation for popping a sprinkler in the Jail in 2017 and for helping other inmates file lawsuits. ECF 12 at 40-45.[9] Plaintiff also alleges that Camp, Smith, Sandefur, and the DCJ Jailers "carried out" these "directives" and were "acting under the orders of their supervisors." *Id.* at 43-45. In Count 5, Plaintiff brings a civil conspiracy claim under § 1985 alleging that Boyd and James conspired with Green and Grisham to deprive him of "Equal Protection under the law" by denying him religious accommodations for Ramadan and when Grisham called him names. He also claims under § 1986 that Boyd, James, Holder, Green, and Grisham failed to stop or prevent the conspiracy. *Id.* at 48-50.

To demonstrate the existence of a § 1983 conspiracy, Plaintiff must allege, among other things, a meeting of the minds among the conspirators "sufficient to

[9] For the reasons set out above, Boyd and James are dismissed from this count.

support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798-99 (8th Cir. 2013). Similarly, a § 1985 conspiracy requires Plaintiff to "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Johnson v. Perdue*, 862 F.3d 712, 717-18 (8th Cir. 2017) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989)). In other words, there must be some showing of "a meeting of the minds or understanding among the conspirators to achieve the conspiracy's aims." *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996)). Plaintiff can satisfy this burden by "pointing to at least some facts which would suggest [the defendants] 'reached an understanding' to violate [his] rights." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016) (quoting *City of Omaha*, 883 F.3d at 59) (alterations in *Bonenberger*).

Between Plaintiff's September 2017 transfer out of DCJ and his May 2018 return to DCJ, the U.S. Marshal Service had to move Plaintiff to at least four different facilities for holding. ECF 12 at 25-32. Plaintiff admits that his 2017 complaints to a federal judge about DCJ conditions resulted in the Marshal Service searching the federal holding cells for drugs.[10] Plaintiff also admits that during his

[10] It appears nothing was found in the search.

2017 stay at DCJ, he intentionally popped a sprinkler-head and flooded the Jail.  At a different holding facility in 2017, Plaintiff attempted suicide.  By 2018, Plaintiff considered himself a "jailhouse lawyer," and his Second Amended Complaint sets out in detail multiple lawsuits he helped other inmates file, most of which were against jail employees.  Plaintiff himself has filed over 100 federal lawsuits. Moreover, within Plaintiff's first year of incarceration in 2008-09, he had already filed enough frivolous lawsuits to have future suits dismissed under the three-strikes rule.  Given that context, it was not unreasonable for the Marshals Service to reach an agreement with DCJ on some terms of detention when they sought to move Plaintiff back to DCJ in May 2018.  Nor was it unreasonable for DCJ administrators to have safety and security concerns about bringing an inmate back to the same Jail the inmate had intentionally flooded within the past year.  It was therefore reasonable that deputy marshals Boyd and James agreed with jail administrator Green that Plaintiff be placed in a more restrictive detention setting, such as a medical isolation cell, for security reasons.  It was also reasonable that a single point-person or decisionmaker was designated to oversee Plaintiff's Jail requests, as indicated by the sign stating that Plaintiff could only talk to Green. Viewing Plaintiff's allegations *in toto*, it appears that the restrictive arrangements were made for jail management and security purposes and not, as Plaintiff urges, because of an agreement among the defendants to deprive Plaintiff of his constitutional right to the basic necessities of life.

Plaintiff has not pled with particularity, nor has he specifically alleged, material facts showing that the defendants reached an agreement to violate his constitutional rights, as required to state a conspiracy claim under §§ 1983 or 1985. *Johnson*, 862 F.3d at 717-18.  Plaintiff makes no allegations reasonably linking Boyd and James to any overt acts of constitutional deprivation that allegedly occurred at DCJ.  Nor do the facts alleged suggest that they reached any agreement with the purpose of depriving Plaintiff of any constitutional right.  There simply is not enough here to state a conspiracy claim.  *See Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 747 (8th Cir. 2022) (dismissing defendant where pleadings alleged that he "agreed to participate" in violations of civil rights and "shared the conspiratorial objectives" to punish, finding these allegations did not "contain specific and plausible allegations" linking defendant to "the overt acts" allegedly taken by other defendants).  Moreover, there are no facts to support Plaintiffs' assertion that Boyd and James conspired with Jail employees to deprive Plaintiff of religious accommodations.  There is no allegation that they knew Plaintiff was a practicing Muslim or that he intended to observe Ramadan once transferred to DCJ.  The conspiracy claim in this regard is conclusory.

Conspiracy claims under §§ 1983 and 1985 require heightened review of the pleadings.  The claims must be supported by particular material facts that demonstrate an agreement among the defendants.  Plaintiff does not provide those facts here.  It is not enough to state that defendants "reached an agreement."

Plaintiff must assert facts to demonstrate such agreement. Plaintiff's sweeping allegations of conspiracy under §§ 1983 and 1985 are conclusory and fail to state a claim upon which relief may be granted. As a result, Plaintiff's claim under § 1986 that defendants failed to stop or prevent the conspiracy likewise fails. *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1055-56 (E.D. Mo. 2014).

Counts 1 and 5 will be dismissed.

C. Count 2 – First Amendment Retaliation

"To succeed on [a] § 1983 retaliation claim, [Plaintiff] must prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [him] that would chill a person of ordinary firmness from engaging in that activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). Both filing a prison grievance and filing an inmate lawsuit are protected First Amendment activities. *Id.*

In this case, Plaintiff alleges that defendants Boyd, James, Green, Grisham, Smith, and Sandefur retaliated against him by transferring him back to DCJ in 2018 and placing him in a medical isolation cell; and by denying him hygiene, clothing, and access to the telephone, grievance kiosk, and commissary. ECF 12 at 45-46.[11] Plaintiff asserts that this retaliation was on account of his filing numerous

[11] Both Boyd and James have been dismissed from this count.

lawsuits and his actions as a "jailhouse lawyer."  However, given Plaintiff's admitted conduct of intentionally flooding DCJ, attempting suicide, and alleging in court filings that he was in danger from fellow inmates (*see id.* at 23-27), it was not unreasonable for DCJ administrators to restrict Plaintiff's access to certain items and to place him in an isolation cell where he could be closely monitored.  The facts alleged in the Second Amended Complaint are not sufficient to connect his protected First Amendment activity of filing lawsuits on his own behalf to his cell assignment and restricted access to items and privileges.  Plaintiff's alleged facts only demonstrate a "mere possibility of misconduct," and that is not enough to state a plausible claim for relief.  *Iqbal*, 556 U.S. at 679.

Moreover, a First Amendment retaliation claim requires not only that a prisoner demonstrate that a correctional officer took an adverse action, but also that the action "would chill a person of ordinary firmness from continuing in the [protected] activity."  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).  The "ordinary-firmness test" is designed to weed out trivial matters from substantial violations of the First Amendment.  *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013).  Although this test is an objective one, Plaintiff's subjective actions in response to the alleged retaliation can be evidence of what a person of ordinary firmness would have done.  *Id.*; *see also Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (in considering the ordinary-firmness test, the court noted that the "record reflects . . . [plaintiff] continued to speak out . . . on numerous

occasions."). In this case, court records do not indicate that the alleged retaliatory acts "chilled" Plaintiff from filing further lawsuits. Indeed, a review of federal court records indicates that Plaintiff has filed over thirty lawsuits since 2018.[12]

For all of these reasons, Plaintiff's Second Amended Complaint does not state a plausible claim of First Amendment retaliation. Plaintiff fails to allege facts showing a casual connection between his filing of lawsuits and any purported retaliatory acts. This claim will be dismissed under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.

D. Counts 3 and 4 – First Amendment Free Exercise of Religion and RFRA[13]

Plaintiff alleges that he was denied religious accommodations in violation of his First Amendment right to freely exercise his religion (Count 3) and in violation of RFRA (Count 4). ECF 12 at 46-48. Boyd and James have already been dismissed from Count 3. The remaining defendants as to that count are Green,

[12] Notably, in January 2019, Plaintiff filed an "Application for Preservation of Evidence" in this Court, which pertained to the same allegations and defendants as in this action and alleged that his constitutional rights had been violated when he was held in a medical isolation cell in DCJ in 2018. *See Moon v. Dunklin Cnty. Jail*, Case No. 1:19CV17 ACL (E.D. Mo. Jan. 28, 2019) (denied relief requested and recognized futility of construing application as a § 1983 complaint because Plaintiff was subject to the three-strikes rule).

[13] Prisoner-plaintiffs often bring claims concerning the denial of access to religious items under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-1(a), *et seq.*, which protects the religious-exercise rights of incarcerated persons. Presumably, Plaintiff does not raise a RLUIPA claim here because RLUIPA does not authorize individual capacity claims against prison officials, and Plaintiff's Second Amended Complaint brings claims against the defendants in their individual capacities only. *See Blake v. Cooper*, No. 10-CV-6063-SJ-FJG, 2013 WL 523710, at *1 (W.D. Mo. Feb. 12, 2013). For this reason, I will not liberally construe the Second Amended Complaint to contain a RLUIPA claim.

Holder, Grisham, Camp, Smith, Sandefur, and the Jailers. As to Count 4, Plaintiff names Boyd, James, Green, Holder, Sandefur and the Jailers.

Plaintiff describes himself as a Sunni Muslim and asserts that his First Amendment free-exercise right was violated when the DCJ defendants, at Boyd's and James' direction, denied him a Ramadan fasting schedule and a towel to use as a prayer rug. ECF 12 at 46. According to Plaintiff, he wanted to observe Ramadan, which occurred during his detention at DCJ in May and June 2018. Plaintiff states that his observation required a Holy Quran, a rug or towel to pray on, and a minimum of five daily prayers. *Id.* Plaintiff asserts that he made multiple requests for a towel to use as a prayer rug, and to receive meals only before sunrise and after sunset. Although he claims he made the requests through the intercom and does not identify to whom he made the requests directly, he alleges that they were denied by "Nicole [Green] and Bob Holder … per Ned Boyd and Patrick James." *Id.* at 47. Plaintiff likewise does not state when or from whom he requested a Holy Quran, or who denied his request. He asserts that as a result of those denials, he was "unable to perform his 5 daily Islamic prayers, nor observe Ramadan." *Id.* Although not mentioned in his "Legal Claims" for relief, Plaintiff alleges in his "Statement of Claim" that he was denied a clock in his cell that was needed to determine the time for daily prayers. ECF 12 at 34.[14]

[14] Plaintiff also asserts that some defendants mocked and verbally abused him, sometimes referencing his religion. *See* ECF 12 at 34-35. However, in general, allegations of "unspecific

As to his RFRA claim, Plaintiff alleges that defendants "substantially burdened" his exercise of his religious beliefs by denying him a towel to pray on, a Quran when requested "on various occasions," and meals before sunrise and after sunset. ECF 12 at 48. Plaintiff seeks damages under RFRA against defendants Boyd and James only. *Id.*

Under the First Amendment's Free Exercise Clause and RFRA, Plaintiff must first allege facts demonstrating that the prison placed a substantial burden on his ability to practice his religion. *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); *see also Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) ("As an initial matter, a person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief.").

> To constitute a substantial burden, the government policy or actions must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004). While inmates retain their First Amendment right to free exercise of religion in prison, *O'Lone v.*

verbal harassment" do not state a claim under § 1983. *See Williams v. Harness*, 221 F.3d 1346, 1346 (8th Cir. 2000) (per curiam) (citing *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir.1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983)).

*Estate of Shabazz*, 482 U.S. 342, 348 (1987), there are limitations on that right "in light of the needs of the penal system." *Murphy*, 372 F.3d at 982. A prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security. *Id.*

Plaintiff does not state what, if any, reason was given to him for the denial of his religious-accommodation requests. Regarding his request for a fasting schedule and a prayer rug, he fails to allege sufficient facts to suggest that his ability to practice his religion was substantially burdened or that another item would not have been adequate for his religious exercise. *See Patel*, 515 F.3d at 815 (holding a prisoner-plaintiff must show he "has exhausted alternative means of accommodating his religious . . . needs" to prove a substantial burden under the Free Exercise Clause); *see also Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833-34 (8th Cir. 2009). Plaintiff does not allege that there was no other cloth item in his cell that he could have used as a prayer rug. Nor does he allege that he was prohibited from keeping food in his cell so that he could consume his meals before sunrise or after sunset. It is also unclear from his allegations as to how long he was confined at DCJ during the Ramadan holiday. If the denial of religious food accommodation was intermittent, there is no constitutional violation. *See Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1054 (8th Cir. 2020) (noting that "there is

extensive . . . agreement that an isolated, intermittent, or otherwise *de minimis* denial or interruption of an inmate's religiously required diet does not substantially burden his religious belief."). Because the facts alleged regarding a fasting schedule and prayer rug are insufficient to show a substantial burden on Plaintiff's right to freely exercise his religion, I will dismiss his First Amendment and RFRA claims relating thereto.

Plaintiff's allegation that he was denied access to a Holy Quran, however, sufficiently states a claim that he was denied his right to freely exercise his religion. Unlike a prayer rug or fasting schedule, there is no reasonable alternative to or substitution for the Quran for purposes of religious observance. Although Plaintiff does not state from whom he requested a Quran, the alleged facts and circumstances viewed as a whole appear to show that jail administrator Green was the decisionmaker on all of Plaintiff's requests. I will therefore direct that process issue on Plaintiff's First Amendment free-exercise claim against defendant Green in her individual capacity. This claim is limited to Plaintiff's allegation that he was denied access to a Holy Quran.

E.     Count 8 – Substantive Due Process

Plaintiff claims that his being detained in the medical isolation cage in sometimes "freezing" conditions and being denied access to hygiene and clothing items, to the telephone and commissary, and to the grievance kiosk violated his right as a pretrial detainee to substantive due process. He also claims that his

substantive due process rights were violated when his mattress was removed from his cell after he was sentenced in July 2018. He brings this claim against all individual defendants except Dr. Prewitt.

The Eighth Amendment's Cruel and Unusual Punishment Clause applies to an inmate after he has been both convicted and sentenced for his crimes. *See Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989). Accordingly, an inmate awaiting sentencing must look to either the Fifth or Fourteenth Amendment's Due Process Clause for protection. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). While the distinction between the Cruel and Unusual Punishment Clause and the Due Process Clause "makes little difference as a practical matter" because the same legal standard is applied, *see Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007); *see also Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023);; *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004), "the Due Process Clause prohibits any punishment of a pretrial detainee, be that punishment cruel-and-unusual or not." *Smith v. Conway Cnty., Ark.*, 759 F.3d 853, 858 (8th Cir. 2014). *See also Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (pretrial detainees afforded greater protection than convicted inmates in that the Due Process Clause prohibits detainees from being punished).

Plaintiff here challenges conduct that occurred both before and after his July 2018 sentencing. Accordingly, while the analysis is the same, I look to both the Due Process Clause and the Eighth Amendment's Cruel and Unusual Punishment

Clause for his claim.

The Eighth Amendment limits conditions of confinement and prohibits cruel and unusual punishment. *Robinson v. California*, 370 U.S. 660 (1962); *Rhodes v. Chapman*, 452 U.S. 337 (1981). Inmates have a protected liberty interest in avoiding conditions of confinement that impose an "atypical and significant hardship on [them] in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). To establish an Eighth Amendment conditions-of-confinement claim, a prisoner must demonstrate that: (1) the alleged deprivation was "objectively, sufficiently serious" to result in the "denial of the minimal civilized measure of life's necessities"; and (2) the defendant whose act or omission caused the alleged constitutional deprivation behaved with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted); *see also Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004). With respect to the "civilized measure of life's necessities," prison officials are required to ensure that inmates receive adequate clothing, food, shelter, and medical care. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 832). Inmates are entitled to humane treatment and the basic necessities of human life, including personal hygiene items. *Goff v. Menke*, 672 F.2d 702, 705 (8th Cir. 1982); *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (stating that prisoner's allegation that he had been denied personal hygiene items stated a claim under § 1983). The long-term,

repeated deprivation of adequate hygiene supplies may give rise to an Eighth Amendment violation. *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996); *Perry v. Agricultural Dep't*, No. 6:14-168-DCR, 2015 WL 1757946, at *19 (S.D. Ky. Apr. 16, 2015).

1. *Jail Administrator Nicole Green*

"Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990); *see also Martin*, 780 F.2d at 1338 (to be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights). "Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

Plaintiff states that for a "few months," his repeated requests for hygiene items – including a toothbrush, toothpaste, soap, lotion, and deodorant – were denied. ECF 12 at 33-34. He further alleges that he was "forced to defecate without the ability to clean himself, since he had no toilet paper . . . for the entire time [he] was in the medical isolation cell." *Id.* at 35. Plaintiff was only allowed to request items from jail administrator Green. These allegations, taken as true, are sufficient to state a claim that Green denied Plaintiff the minimal civilized measure of life's necessities while he was confined at DCJ in 2018. I will therefore direct the Clerk of Court to issue process or cause process to issue to defendant Nicole

Green, in her individual capacity, as to Plaintiff's claim that the alleged conduct in denying him adequate hygiene supplies during his months-long confinement violated his right to due process as a pretrial detainee and his right to be free from cruel and unusual punishment as a convicted and sentenced inmate.

2. *Individual DCJ Defendants*

As to the thirteen other DCJ defendants, Plaintiff's sweeping allegations are not enough to state a claim upon which relief may be granted against them.  To state a § 1983 claim for relief, Plaintiff must allege with specificity what each defendant did to violate his rights.  *See Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974); *see also Krych v. Hvass*, 83 F. App'x 854, 855 (8th Cir. 2003). Although pleadings from self-represented litigants should be construed liberally, the complaint must at the very least contain facts that state a claim as a matter of law.  *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995).  A complaint must plead more than "legal conclusions" and must have more support than "mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Here, Plaintiff asserts that he had "day-to-day contact" with thirteen DCJ defendants (Grisham, Camp, Smith, Sandefur, and the Jailers) and that they all denied his repeated requests for hygiene items.  ECF 12 at 34.  He also alleges that "[o]n different times and occasions," these thirteen defendants denied him a

shower and change of clothing.  *Id.* at 35.  Plaintiff further asserts that Sheriff Holder was involved in the denial of necessities in that he, along with others, denied Plaintiff a blanket or mattress for a two-week period between July 16 and July 29, 2018.  *Id.* at 36-39.

Plaintiff's generalized allegations are conclusory and lack facial plausibility. His claim that he had contact every day with each of the 13 defendants while he was in the medical cell is unreasonable, especially given his contrary claim that he was permitted to speak to only defendant Green during that time.  Moreover, Plaintiff asserts that the thirteen DCJ defendants denied his requests because of Green – that is, Green was the decisionmaker on all of Plaintiff's requests. Plaintiff does not allege that the thirteen DCJ defendants were personally responsible for the alleged denial of his constitutional rights or acted with the requisite culpable state of mind.

In addition, Plaintiff's allegations that he was denied a shower or clothing on various occasions, and bedding for two weeks, are not enough to state an actionable claim.  There is no absolute Eighth Amendment right to not be put in a cell without clothing or bedding.  *See Williams v. Delo*, 49 F.3d 442, 444-46 (8th Cir. 1995) (finding placement in strip cell without water or mattress for four days did not violate Eighth Amendment).  The length of time an inmate spends in such a condition is a factor in determining whether there has been a constitutional violation.  *Id.*; *see also Scott v. Carpenter*, 24 F. App'x 645, 647-48 (8th Cir. 2001)

(finding no denial of "minimal civilized measure of life's necessities" when prisoner was able to shower only fifteen times in six months including a twenty-eight-day period without a shower); *Cribbs v. Pollock*, No. No. 1:22-CV-05796 SEC P, 2023 WL 1937337, at *3 (W.D. La. Jan. 24, 2023) (citing cases) (temporary conditions of denial of mattress, toilet paper, shower, canteen privileges, functioning toilet do not amount to punishment).

Plaintiff does not assert factual allegations demonstrating that the thirteen DCJ individual defendants were personally involved in the alleged denial of humane treatment and the basic necessities of life or had the culpable state of mind to do so as punishment. Plaintiff's allegations against those defendants are insufficient to show an unconstitutional deprivation by them, and I will dismiss Plaintiff's due process/cruel and unusual punishment claim against them.

3.   *Deputy Marshals Boyd and James*

As with the DCJ individual defendants, Plaintiff alleges that Boyd and James were responsible for his conditions of confinement at DCJ. Several courts have held, however, that *Bivens* cannot be extended to reach "non-medical care conditions of confinement" claims. *See Cribbs*, 2023 WL 1937337, at *3, n.2 (listing cases). On this basis alone, Plaintiff cannot state a claim against these federal officials under *Bivens* for the non-medical conditions of confinement alleged in Count 9. *Id.* at *3. But even if *Bivens* applied, Plaintiff does not state sufficient facts showing that Boyd and James were responsible for conditions of

confinement that amounted to punishment.  *See id.* at *4.

As discussed above, it was not unreasonable for the deputy marshals to agree that Plaintiff be confined in a restrictive setting, such as a medical isolation cell, for safety and security reasons given Plaintiff's admitted history of intentionally flooding the Jail and attempting suicide within the previous year.  As to the alleged denial of Plaintiff's requests for hygiene items and access to the commissary or grievance system while housed at DCJ, Plaintiff alleges no facts and offers only specious conclusions suggesting that Boyd and James had decision-making authority in that regard and/or were personally responsible for or directly involved in such denied access.  Indeed, there is nothing to suggest that the deputy marshals were personally involved in *any* access decisions at DCJ once Plaintiff was placed there.  Like the complaint in *Iqbal* – which alleged that supervisory officials knew of, condoned, and willfully and maliciously agreed to subject the plaintiff to harsh conditions for an illegitimate reason – Plaintiff's allegations here are conclusory and not entitled to a presumption of truth.  556 U.S. at 680-81.

Because Plaintiff does not assert sufficient factual allegations demonstrating that either Boyd or James was personally involved in the alleged denial of humane treatment and the basic necessities of life that give rise to his claim, he fails to state a conditions-of-confinement claim against these defendants and they will be dismissed.

F.     Count 9 – Denial of Medical Care

In Count 9 of his Second Amended Complaint, Plaintiff seeks damages against only Dr. Pewitt and Nurse Grisham, alleging that they denied him medical care.  Plaintiff's allegations giving rise to this claim are brief in that he asserts that he had blood in his urine and pain when urinating, and that he "tried to notify" both Pewitt and Grisham of these conditions.  ECF 12 at 55.[15]  These alleged facts are insufficient to state either a Fourteenth Amendment due process claim or an Eighth Amendment claim of deliberate indifference to serious medical needs.[16]

A jail official's intentional denial of or delayed access to medical care for a prisoner's serious injury constitutes unnecessary and wanton infliction of pain, giving rise to a claim of deliberate indifference to that prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  To prevail on a claim of deliberate indifference, Plaintiff must demonstrate that he suffered from an objectively serious medical need and that prison officials actually knew of and deliberately disregarded that need.  *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019).  "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th

---

[15] Although Plaintiff fails to name Dr. Pewitt in his "Statement of Claim" (*see* ECF 12 at 12-40), he includes him in the "Legal Claims" section of his Second Amended Complaint.  *Id.* at 55.

[16] Plaintiff contends that he experienced the symptoms "at some point."  ECF 12 at 36.  It is unclear whether this occurred before or after he was sentenced.

Cir. 2014)).  Under the subjective component, an official is deliberately indifferent

if they know of and disregard an excessive risk to inmate health or safety.  The

official must be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and they must also draw the inference.

*Farmer*, 511 U.S. at 837.  "This showing requires a mental state akin to criminal

recklessness."  *Barton*, 820 F.3d at 965 (quoting *Jackson*, 756 F.3d at 1065).

Medical malpractice, inadvertent failure to provide adequate medical care, or

simple negligence do not amount to a constitutional violation.  *Dulany v.

Carnahan*, 132 F.3d 1234, 1239, 1243 (8th Cir. 1997).

Here, Plaintiff alleges only that he asked Grisham for medical attention, that

she told him to go to sleep and to file a lawsuit, and that he "tried to notify" Pewitt

and Grisham of the issue.  ECF 12 at 36, 55.  Plaintiff provides no facts as to how

long he experienced his claimed symptoms, when and how they resolved, or the

nature of his attempts to "notify" Pewitt and Grisham of the issue other than his

one interaction with Grisham.  I cannot assume facts not provided.

Nevertheless, even if Plaintiff's claimed symptoms that he reported to

Grisham were enough to give rise to an objectively serious medical need, Plaintiff

fails to allege facts demonstrating that Grisham knew that the condition "created an

excessive risk to [his] health and then failed to act on that knowledge."  *Dulany*,

132 F.3d at 1239 (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).  With

nothing more, Grisham's alleged instruction that Plaintiff go to sleep is not

sufficient to show that she knew his claimed condition created an "excessive risk" to his health and that she deliberately failed to act. *Cf. Youngblood v. Corizon*, No. 1:19CV28 RLW, 2019 WL 4194887, at *2 (E.D. Mo. Sept. 4, 2019) (subjective component met when prisoner-plaintiff experienced vomiting, inability to walk or eat, and sharp flank pain for several days; self-declared several medical emergencies; and nurse considered him to be faking and returned him to his housing unit).

Plaintiff's claim that he "tried to notify" Pewitt and Grisham of his medical complaint implies a third-party channel that he went through to seek treatment. He does not identify this channel, whether it be a person or a procedure. Other than his isolated complaint to Grisham in his cell, Plaintiff fails to identify as to where or to whom he directed his medical complaints. "Trying to notify" medical providers of a condition without alleging direct personal action is insufficient to establish that those providers are personally liable under § 1983. *See Martin*, 780 F.2d at 1338 (to be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights).

Plaintiff's claim that defendants Prewitt and Grisham were deliberately indifferent to his serious medical needs will be dismissed under 28 U.S.C. § 1915(e)(2)(B).

G.    *Monell* Claim Against Dunklin County

Plaintiff brings a claim of *Monell* liability against defendant Dunklin County.  In *Monell*, the Supreme Court held that a municipality or local governing body can be directly liable under § 1983.  436 U.S. at 690.  Such liability may attach if the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018).  Plaintiff does not raise a failure-to-train claim.

Plaintiff claims that "he was the victim of a policy and practice of the jail to retaliate against any detainees, state or federal, who filed grievances or lawsuits against the jail, or the County of Dunklin."  ECF 12 at 40.  To support this claim, Plaintiff asserts only that while being detained at the DCJ, he

> became aware that detainees, especially state detainees, who filed lawsuits against the jail and the employees who work there, were targets [of] defendants Green and Holder, . . . [were] always put on commissary 'restriction' by accident, [and] moved to the booking area without explanation and kept up there for months at a time, until they decided to dismiss their civil case or stop filing grievances.

*Id.* at 39-40.

 "'To prove the existence of a policy' for municipal liability purposes, [Plaintiff] may point to 'an official policy' or 'a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Hall v. Higgins*, 77 F.4th 1171, 1180 (8th Cir. 2023) (quoting *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016)).  *See also Nix v.*

*Norman*, 879 F.2d 429, 433 (8th Cir. 1989).  "A policy may be either a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body."  *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1546 (8th Cir. 1992).

Although Plaintiff here labels actions of Dunklin County as "policy," he does not appear to allege that Dunklin County actually has "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body" regarding retaliation for filing grievances or lawsuits.  *See Angarita*, 981 F.2d at 1546.  Instead, he appears to argue that Dunklin County has an unconstitutional "custom" of restricting commissary access and placing inmates in booking-area cells in retaliation for their filing grievances or lawsuits.  For a municipal liability claim based on an unconstitutional "custom," a plaintiff must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

Here, Plaintiff's allegations are not sufficient to demonstrate an

unconstitutional custom.  His claimed "awareness" of alleged retaliatory conduct is not enough to establish a "continuing, widespread, persistent pattern of unconstitutional misconduct."  *Johnson*, 725 F.3d at 828.  Moreover, Plaintiff does not allege that he was himself "injured by acts pursuant to the governmental entity's custom."  *Id.*  He does not allege that his commissary was restricted "by accident" or that he was moved to a booking-area cell until he dismissed a lawsuit or complaint.  Instead, he asserts only that he was aware that other detainees who filed lawsuits, apparently with his assistance, were experiencing this conduct. Plaintiff is well-aware that he cannot bring claims on behalf of other inmates.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (generally, to satisfy the standing requirement, a plaintiff "must assert his own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties"); *Martin*, 780 F.2d at 1337 ("[a] prisoner cannot bring claims on behalf of other prisoners").

Because Plaintiff does not allege facts showing his own injury by the alleged custom and cannot assert a *Monell* claim based on injuries allegedly suffered by other inmates, he has failed to sufficiently allege a *Monell* claim against defendant Dunklin County to survive initial review.  I will therefore dismiss the claim and defendant Dunklin County under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim against it upon which relief may be granted.

H.    State-Law Claims

According to an independent review of state-court records on the State of

Missouri's online docketing system, Missouri Case.net, Plaintiff filed a case in the Circuit Court of Dunklin County, Missouri, in March 2023 (before this federal action was filed in April 2023) against several defendants alleging claims similar to those here, including claims under Missouri law of negligence, negligence per se, and intentional infliction of emotional distress. *Moon v. Green*, No. 23DU-CC00037 (35th Jud. Cir. 2023). One of the named defendants in that action is jail administrator Nicole Green. To date, Plaintiff's action is still pending in that court.

The only claims that survive initial review here are Plaintiff's § 1983 claims against jail administrator Green for the alleged violation of his First Amendment free-exercise right with regard to the denial of a Holy Quran, and his due process/ Eighth Amendment right to be free from cruel and unusual punishment with regard to the deprivation of personal hygiene items. The claims that Plaintiff seeks to bring under Missouri law – civil conspiracy, false imprisonment, negligence, negligence per se, and intentional infliction of emotional distress – are primarily based on tort law and would require proof of negligence. Because there is no cause of action under § 1983 for negligence, *see Mbonyunkiza*, 956 F.3d at 1054-55 (negligent conduct not enough to establish a violation of an underlying constitutional right in § 1983 claim), Plaintiff's state-law tort claims will require different proof and legal standards. They are best left to the state court to decide in Plaintiff's pending state-court action. *See also Bonner v. Circuit Court of City of St. Louis, Mo.*, 526 F.2d 1331, 1336 (8th Cir. 1975) ("Congress and the federal

judiciary have consistently recognized that federal courts should permit state courts to try state cases, and that where constitutional issues arise, state court judges are fully competent to handle them subject to Supreme Court review.").

"[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966). *See also* 28 U.S.C. § 1367(c)(2).  As Missouri state court is the best venue for evaluation of Plaintiff's claims based on Missouri state law, and Plaintiff currently has a pending state-court action on these claims against the only remaining defendant, I decline to exercise supplemental jurisdiction over these state-law claims and will dismiss them without prejudice for Plaintiff to continue to pursue them in state court.  28 U.S.C. § 1367(c)(2).

## V.  Conclusion

Based on a liberal construction of Plaintiff's Second Amended Complaint, I conclude that Plaintiff has sufficiently stated a claim that defendant Nicole Green's denial of a Holy Quran during Ramadan violated his First Amendment right to freely exercise his religion, and that her months-long decisions to deny Plaintiff personal hygiene items violated his due process/Eighth Amendment right to be free from unconstitutional punishment.  I will therefore order that process issue to defendant Green in her individual capacity on those claims.  Plaintiff fails to make

sufficient factual allegations as to his other asserted federal claims and as to the other defendants to survive initial review under 28 U.S.C. § 1915(e)(2)(B), and those claims and defendants will be dismissed. Finally, I decline to exercise supplemental jurisdiction over Plaintiff's state-law claims, which are already pending in state court.

Accordingly,

**IT IS HEREBY ORDERED** that the Clerk of Court shall **not** issue process or cause process to issue upon the Second Amended Complaint as to defendants Ned Boyd, Patrick James, Bob Holder, Corey Camp, Mallory Snow, Jimmy Smith, Marishia Sandefur, Ashley Grisham, Charles Pewitt, Brandon Perkins, Ruby Lopez, Joe Nelson, Unknown Cueland, David Pierce, Kyle Simms, Jackie Burton, Unknown West, and Dunklin County, because, as to these defendants, the Second Amended Complaint fails to state a federal claim upon which relief can be granted. Plaintiff's federal claims against these defendants are **DISMISSED without prejudice**. *See* 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that the Clerk shall issue process or cause process to issue upon the Second Amended Complaint as to defendant Nicole Green, in her individual capacity only, with regard to Plaintiff's First Amendment and due process/Eighth Amendment claims. Defendant Nicole Green shall be personally served by issuance of summons and service by the U.S. Marshals Service at the Dunklin County Sheriff's Office, 1175 Floyd Street, Kennett, MO

63857.

**IT IS FURTHER ORDERED** that, to the extent Plaintiff raises claims under Missouri state law in his Second Amended Complaint, those claims are **DISMISSED without prejudice** to be pursued in state court.

**IT IS FINALLY ORDERED** that Plaintiff's motion for an expedited screening [17] is **DENIED as moot**.

An Order of Partial Dismissal will accompany this Memorandum and Order.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 28th day of March, 2024.